Our next case on the call of the docket is agenda number 1111 case number 113909 John Russell vs. SNFA. Counselor for the appellant, please proceed. Good morning, your honors, and may it please the court. I'm Scott Howey, and I represent the defendant appellant in this matter, SNFA, a French corporation with no place of business in this state, no contracts in this state, no representatives in this state, no presence corporate, virtual, or physical in this state of any kind in Illinois, no contracts, assets, or operations in this state. No contacts related in any way to this cause of action, and no continuous or systematic contacts of any kind. The exercise of jurisdiction over SNFA violates constitutional guarantees of due process and exceeds the limits long ago placed on the stream of commerce theory by the Supreme Court of the United States and recognized 25 years ago by this court in Wiles v. Morita Iron Works, and least recently reiterated by the Supreme Court in McIntyre Machinery v. Nicastro. The issue in this case is whether a foreign manufacturer of component parts can be subject to jurisdiction in Illinois based solely on its overseas sales of those parts, with the knowledge only that some of them could be incorporated into larger products that might find their way to anywhere in the world. In McIntyre, the Supreme Court found jurisdiction to be at odds over a manufacturer, even for a manufacturer, with far more extensive involvement in the US market than SNFA has had here, because that manufacturer had not purposefully directed its conduct toward the forum state of New Jersey. A total of six justices in McIntyre squarely rejected the New Jersey Supreme Court's holding that that state could exercise jurisdiction over a foreign manufacturer just because it was foreseeable that its products were distributed through a nationwide distribution system that might lead to those products being sold in any of the 50 states. A rationale that closely echoed this Court's decision 25 years earlier in Wiles, where it recognized that while it would be reasonable to assume that a defendant might have availed itself of the United States market, there is no showing in the record that that defendant purposefully directed its products into Illinois. The appellate court's decision in this case rests upon that same discredited standard of foreseeability, and just as the Supreme Court rejected it in McIntyre, just as this Court rejected it 25 years ago in Wiles, this Court should again reject it and reverse the appellate court's decision reversing the circuit court's order dismissing SNFA from this case. This case arises from the 2003 fatal helicopter crash, which the plaintiff blames on allegedly defective helicopter tail rotor bearings manufactured by SNFA. SNFA has no U.S. customers for its helicopter bearings, and never has. In fact, the bearings at issue here were custom made for a single customer, the Italian helicopter maker Augusta SPA, also a defendant in this case, and were sold to Augusta by SNFA in Italy. Augusta sold helicopters around the world and in the U.S. through its own subsidiary, AAC. Discovery has shown without contradiction that SNFA had no control over what Augusta did with the bearings it bought from SNFA or where they went, and SNFA didn't know what would become of any particular bearing it produced or sold or where it would go. In fact, Augusta and AAC have both independently confirmed that they did not consult with SNFA in any way concerning the ultimate destinations of the bearings or the marketing or sale of SNFA or Augusta products. SNFA had only the most general notions of the specific destinations or uses to which its bearings might be put. It knew, of course, that its bearings were intended for use in Augusta helicopters, but it also knew that those bearings could be retained by Augusta in Italy or could be sold individually as spare parts. And it was aware that some of those uses could potentially bring those bearings to any place in the world, including to American shores. But it did not have any awareness or knowledge that its bearings would be sold or marketed in this state. And without any evidence of that awareness, there is no proper basis for finding personal jurisdiction over SNFA here. This court set forth that principle in Wiles, and the appellate court, until this case, has followed it consistently in cases like Morris v. Halsey Enterprises and Dickey v. Cannondale Corporation, cases that are conspicuously unmentioned in the appellate court's decision here. That principle has also been followed, and jurisdiction was found in the Second District's decision of Soraya v. Chrysler Corporation. But all these cases stem from the Supreme Court's construction of the stream-of-commerce theory as set forth first most prominently in the Asahi v. Superior Court decision, which the Supreme Court recently reiterated in McIntyre. And these authorities... two justices in concurrence, and two more in dissent. I think my math is right. Three more. Three more. In dissent. In any case, you are asking us to draw a rule from McIntyre that we should move forward with. And I am going to ask you to help me understand where you think the state of the federal law is in light of Justice Breyer's concurrence. Basically, he says he doesn't agree with the strict no-jurisdiction rule that the plurality takes on, nor does he agree with the New Jersey Supreme Court's position. But I have to... in my reading of this, he doesn't really give us a way forward of where a majority of the Supreme Court would fall on all of this. Where does that leave us? Well, what you can draw from McIntyre, you're correct that there is no majority opinion, but there is majority reasoning. And there are certain commonalities among the six justices in the majority, and even commonalities, as we'll see, among all nine justices that point toward reversal in this case. As to what Justice Breyer recognizes and where he agrees with the four-justice plurality, it's quite clear that all six of those justices disagree and reject the New Jersey Supreme Court's construction of the stream-of-commerce theory. If McIntyre stands for anything, it rejects the New Jersey Supreme Court's notion that potential sales in any state make for sufficient minimum contacts in every state. That simply is not the rule under any reasonable reading of McIntyre, nor was it the rule prior to McIntyre. If you look to cases as seminal as Worldwide Volkswagen, or again even this Court's decision in Wiles, all recognize that simply an attempt to serve the U.S. market as a whole can't be considered to be minimum contacts with every state in the union. The only way that minimum contacts can be established through the stream-of-commerce theory are from an attempt to serve a particular state. And what Justice Breyer spoke of in his concurrence was the requirement of something more. Terminology I believe he took from Justice O'Connor's opinion in Asahi. But something more than merely placing a product in the stream-of-commerce overseas and allowing it to wash up on the shores of the United States is required. Something more like special state-related design would be required. Something more like special state-related advertising. The sorts of things that weren't present in McIntyre and therefore didn't support personal jurisdiction there and aren't present in this case and don't support a personal jurisdiction here either. It's important also to recognize in McIntyre, McIntyre very closely resembles this case except for certain aspects of it which actually make personal jurisdiction even harder to justify in the case before this Court. In McIntyre, there was both a foreign manufacturer, the British manufacturer of the machine at issue, and the American distributor with which it worked very closely in the United States to market and sell and distribute those products throughout this country. In fact, the dissent in McIntyre goes into great detail about how closely the British manufacturer worked with the American distributor to saturate the American market if possible. It went to trade shows with the American distributor. It worked very closely with the American distributor. It was very clear that the American distributor considered itself to be the partner for marketing purposes of the British manufacturer. All of that notwithstanding, what the six justices in the majority holding in McIntyre recognized was that despite the extent of those contacts between the British manufacturer and the U.S. market as a whole, there were no specific actions directed toward the forum state of New Jersey. And in this case, we're actually a step removed from the facts of McIntyre because we don't have that close hand-in-glove relationship between the manufacturer, SNFA, and the party who was selling the helicopters containing SNFA products in the United States, AAC. The only thing that SNFA did with its bearings was to sell them to Augusta in Italy. Augusta then resold those bearings to AAC in the United States. AAC sold them all over the world. And while SNFA was certainly aware of the possibility that its product could go anywhere in the world, the Supreme Court has recognized as far back as the worldwide Volkswagen decision that jurisdiction doesn't travel with the chattel. The way that the court memorably put it was that the manufacturer doesn't appoint the chattel its agent for service of process. And so it's a sprawling view of jurisdiction, too sprawling in the Supreme Court's view, that would enable there to be jurisdiction any place in the world that the product might be sold. What minimum context require, and what due process has always required, as far back as the fundamental case of International Shoe that we may even remember from first-year law school, that due process requires there to be some purposeful availment of the forum state. There has to be some... Mr. Howey, there appears to be some sort of a dispute over the existence of the certain business dealings, shipments and sales between SNFA and Illinois Hamilton Sunstrand. Maybe you could clarify this for us. Certainly, Your Honor. First of all, if we're talking about Hamilton Sunstrand, we are not talking about helicopter bearings. And that's an important distinction as to the question between specific jurisdiction and general jurisdiction. The appellate court's decision didn't address the specific jurisdiction aspect, and frankly the plaintiff's brief barely gives it the back of their hand in a single page. But there is... The plaintiff has argued that SNFA's sales to Hamilton Sunstrand in San Diego represent contacts with the U.S. market. They have attempted to transfer those contacts to Illinois by pointing to the fact that Hamilton Sunstrand has an administrative office in Rockford. But keeping in mind that the reference to those bearings, those are aerospace bearings, a very different kind of bearing used in different aircraft with different purposes and an entirely different sales and marketing structure. But because that's a different product and not the product from which the case arose, that would be an issue of general jurisdiction. General jurisdiction, as we know, breaks down into two particular varieties. There is a general jurisdiction, which is jurisdiction essentially for all purposes. Any case that might arise, the defendant would be subject to jurisdiction in the forum state for that. And that requires continuous and systematic contacts with the forum, the sort of contacts that essentially show that the defendant has taken up residence in the forum, made itself at home there, like in the Supreme Court case of Perkins, the Philippine corporation that relocated to the state of Ohio during World War II and set up business there. That's the sort of being at home, continuous and systematic contact that's necessary for general jurisdiction, which is, as I say, is barely referred to by the plaintiff in their brief. And not addressed by the appellate court. What the appellate court addressed was specific jurisdiction. And specific jurisdiction calls for less extensive contacts, but it requires that the cause of action arose out of those contacts. So, Justice Burke, when you mention Hamilton-Sunstrand, you're talking about a different kind of bearing entirely, something that can't be said this cause of action arose out of. The bearing that's at issue here was a tail rotor bearing, one of seven, that are used on the Augusta helicopter and are manufactured in France, sold to Augusta in Italy, and that's the extent of SNFA's sales. SNFA's contacts with the United States involve, as the record shows, involves sales of aerospace bearings to three U.S. customers, Hamilton-Sunstrand in California, and then two other customers, one in Arizona and one in Indiana. But none of those contacts are contacts with the State of Illinois. They are contacts, at most, with the United States. And because they don't concern the product at issue here, and because this case can't in any way be said to have arisen from those contacts, those contacts aren't any basis for specific jurisdiction. That's the key to jurisdiction here, or in any case. The contacts either have to be so continuous and systematic that the defendant has essentially made itself at home in the forum state, which is not the case here, or if they're less pervasive or extensive contacts, then they have to be the basis out of which the case arose, which, again, is not the case here. International SHU is the seminal case that addresses jurisdiction, and it inaugurated the modern view of personal jurisdiction as requiring minimum contacts. Minimum contacts have been defined as those which ensure that the exercise of judicial power over a nonresident is consistent with traditional notions of fair play and substantial justice. And that term, in turn, has been defined by reference to purposeful availment. It requires that the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. As to the helicopter bearings at issue here, there is absolutely no evidence, none whatsoever, that the bearings were sold to Illinois by SNFA or anyone connected with it. The evidence shows, in fact, that the helicopter that's at issue in this case was not even one of those that arrived in Illinois through the distribution system that Augusta employed. The distribution system that Augusta used was to sell its helicopters from Italy to AAC in the United States where they could be sold anywhere in the world. The record shows that only five Augusta helicopters were sold to Illinois purchasers, and only three of them actually into the state. And none of those five is the one that's at issue in this case. The helicopter that crashed arrived in Illinois through a series of transactions with which SNFA had no connection. And, in fact, even Augusta had very little connection. The helicopter was manufactured and sold in 1989. It had a number of owners, including some, at least one in Europe who owned it in Europe, and then eventually made its way to the United States in 1998 when it was sold to Metro Aviation, a Louisiana company who was also a defendant in this case. Metro Aviation installed bearings manufactured by SNFA in Louisiana, and sometime after that it sold the helicopter to an Illinois purchaser who leased it to the operator who was operating it at the time of the crash. Let me ask about Rockwell. I understand it's a federal district court case, not a Supreme Court case, but it seems to be pretty much on point with the facts in this case. Why is it we should not follow Rockwell? Well, respectfully, Your Honor, I'd take issue with the idea that it's on point. It's a 30-year-old decision, which is not just bad law because it's old, but time has passed it by. At the time the federal court decided the Rockwell decision in 1982, Asahi v. Superior Court in the U.S. Supreme Court was still five years in the future. And the requirement that that case set forth, eight justices in Asahi agreed that at the very minimum, the stream of commerce requires a defendant to have some knowledge that its product is to be sold or marketed in the forum state. And that requirement was unknown to the federal district court in Rockwell because it wasn't part of the law then. Had that requirement been part of the law, I think a good argument can be made that the federal district court would have had to have decided the case differently. Also, the passage of time has changed other things. There are key differences in the way in which SNFA does business and the way in which it sells its helicopter products. Has the passage of time also caused a change in the way products are moved around the world? It has. Manufactured in one company, sold to others, and the facts of this case? Has the times changed on that as well? Indeed, it has. Has the law changed as well? Well, the law has changed in ways that are not supportive of personal jurisdiction here. The law has changed to reflect, in some ways to reflect the differences in international commerce, and it has changed to recognize this requirement of some knowledge. Even as business practices have changed, one constant lodestar throughout personal jurisdiction jurisprudence has been the requirement of purposeful availment. Rockwell didn't know of what Asahi would require, that purposeful availment would require, at the very minimum, some kind of knowledge. And as the plurality in McIntyre suggests, something even more than that. And Justice Breyer recognized, too, in McIntyre, something more than merely placing the product in the stream of commerce with the knowledge it might wash up on American shores. I see that my time has expired. If I may take a moment to briefly conclude. The case law is quite clear that purposeful availment is required. There is no evidence of that in this case. And without anything like that, it's crucial that the appellate court's decision be reversed. Thank you. Counsel for the appellee. May it please the court, Mr. Chief Justice, fellow members of the court. My name is Todd Smith, and I am here on behalf of the estate of Michael Russell, the appellee. For almost 70 years since International Shoe, the development of the case law has recognized the expansion of commerce in what they call the modern era. In 1957 in McGee, they discussed the fundamental transformation of a national economy, and I think the question from Justice Freeman a moment ago was addressing the kind of development of an economy that the courts have tried to deal with over time. Gray v. American Radiator, of course, a longstanding leading case, not just in Illinois, but recognized in worldwide Volkswagen, which is really the last. I know Justice Teichu were asking where do we stand. I think we still stand at worldwide Volkswagen, because that's the last statement of a court that garnered a majority of the court with both regard to a judgment and its reasoning in 1980. By the way, I guess an old case as well. Rockwell is criticized for being 30 years old. Worldwide is 33. Both the Gray opinion and the Connolly opinion, despite the protestations of the defendant here, remain solid precedent. You've been called upon to say that from their reply brief at page 15 that Gray and Connolly, your decisions from this court have not stood the test of time, that they have been reversed by a plurality opinion from the U.S. Supreme Court, wherein Justice Breyer could not have made it more clear that he had difficulty with both sides of that case. He could not have made it more clear that he did not in any way agree with the reasoning of the four and the plurality, but just with the judgment reversing in that case the New Jersey Supreme Court. In what way has the defendant done something more that would satisfy Justice Breyer's concurrence in McIntyre? Well, I think Justice Breyer even qualified his statement there. He was quoting the New Jersey Supreme Court, and what he said was their holding had been that they might reasonably see, and my impression there is from reading everything he said, is that he couldn't do it in that case. But I'm not even sure he, if we were counting votes, I'm not sure that he's going to go so far as to say that you don't just simply have straight stream of commerce out of Worldwide Volkswagen at this point. I don't believe he stands for doing something more. I think he was particularly troubled in McIntyre with the fact that it was one, one product. Now, there's some dispute I know in the briefs about whether it was one or four and the facts even in that court, but in his opinion, it was one product that went into New Jersey, one machine. And he was troubled that that one machine going into New Jersey would suddenly mean you've got jurisdiction in all 50 states. We have a much different circumstance here. And when he qualifies his view with regard to McIntyre as in this case I can't do what the New Jersey Supreme Court was saying, I would suggest that with the right set of facts, just as the appellate court did in this case, with the correct set of facts, which I believe we have here, a substantial connection to Illinois. What is that connection? The crash occurred here, but the decedent nor survivors are residents of the state. Pardon me? The decedent. Nor the survivors are residents of the state. The decedent was living in Lake County with his mother, Lake County, Illinois. At the time of the occurrence, he had been working with Air Angels operating out of DuPage at the time. He was a Georgia resident. His family was in Georgia, but he was living with his mother and working here in Illinois at the time. That's the factual situation with respect to him. But I think Illinois, with the occurrence here, we have far more to talk about in terms of the connections of SNFA addressing their minimum contacts with this state. Let me just begin. They've described Hamilton Sunstrand as a California-based manufacturer. That simply isn't the case. In the record that you have, you will see that in 1926, two Rockford companies, Rockford, Illinois, merged into Sunstrand and remained so until the late 90s, almost 75 years, wherein they became Sunstrand, or they were Sunstrand, but remained that way until they were merged with the Hamilton Company and became Hamilton Sunstrand as they were bought by United Technologies. But Rockford, Illinois, was their location. The point of having no contracts in Illinois has been raised with this court, and I would point out that simply isn't accurate. At page 12 of their brief, they say SNFA had never entered into any contracts with Illinois. The fact is that there were two. There was a purchasing agreement, and there in the record, they were entered into with Barbara Barrett from Hamilton Sunstrand at Rockford, Illinois. The first contract, the purchasing contract, lists at the top of the contract the buying location for all of those ball bearings that are being sold to Hamilton Sunstrand as being Rockford, Illinois. It goes on later within that contract. Let me address the second contract first. The second contract that they had also with Barbara Barrett, who was a procurement specialist. Procurements, that sounds like a buyer. Also, the proprietary agreement was signed by Barbara Barrett, again, the folks at Rockford. They claim that there are no channels of customer service and customer service agreements. That's exactly what this proprietary agreement was. It was a service agreement for the exchange of information between the two companies, this company and your Illinois company in Rockford. Substantial connections to Illinois. In the proprietary agreement, there's a provision that says the laws of Illinois will apply to those matters within that contract. Within the contract for purchase of valves that they had with Rockford, and they had with Windsor Lock, Connecticut-based United Technologies. It says in there that the buyer, the Illinois company, the Illinois folks, but Hamilton Sunstrand, the buyer, could sue wherever they wished to, any jurisdiction they wished to, and the defendant, SNFA, agreed to jurisdiction in any court in the land. And they agreed to have the Secretary of State be their agent for service of process within that agreement. So for purposes of developing their business in the United States and in Illinois, they agreed to be subject to personal jurisdiction within this country in virtually all states. But when it comes time to whether they should respond in Illinois for purposes of a matter that happened with regard to a defective product of theirs, they want to have nothing to do with us. I don't believe they should be entitled to it both ways. In the European Union, the agreement there, and this is in our record, the agreement there is where the accident occurs. And I appreciate that that may not be the pure and simple answer here, but the minimum context of this company, and we follow the activities of a company, what have they been doing to be part of Illinois? Contracts with Illinois. Yes, when they declined to say that, calling this company a California company. They are running away from Illinois with all of that. They ask for the protections, of course, of the state of Illinois when they come here. We have visits, by the way. They said they had no, in the facts, no business events. They visited twice to the facilities in Rockford. Meeting there with folks after having come from San Diego apparently as well, and those memos are within your record. They talk in there about the meetings that they had. They also had meetings with Honeywell in Arizona, meetings with our neighboring state, a location for Rolls Royce. Of course, they talk about they only have a couple of customers, but look at the customers they have. These are the major aerospace manufacturers in the world. Rolls Royce engines that go into almost all aircraft. Honeywell in virtually every aircraft that's in the sky. Honeywell products are there, and they're working with them. In the memo that you'll see with respect to a meeting with Rolls Royce, they talk about we are ahead of our U.S. competitors, ahead of our U.S. competitors with respect to the work they're doing there. So they come here and they compete with American companies. They come here and they sell, they make contracts in Illinois, but decline to be part of and be pressed for jurisdiction within our state. Were these the same products that failed in this instance, or is that irrelevant? I believe it's irrelevant. It's a ball bearing manufacturer, a high-end custom ball bearing manufacturer, and that's what they sell. If you're a fruit salesman and you sell pears and bananas and oranges here in Illinois, but not apples, if something happens here in Illinois with respect to an apple, I wouldn't suggest they couldn't be sued here in Illinois where they have sufficient contacts, particularly under circumstances where they have an occurrence right here in Illinois as well. So I don't think that is relevant because I think it addresses in terms of minimum contacts, it goes beyond that because we're looking to their activities, and their activities are ball bearing sales, and they're really all over the United States and in Illinois with those activities. I will address, though, the line of distribution that they did have for the helicopters. Justice Gordon Below spoke to this. He used the Rockwell decision, and I think for good reason. Rockwell is virtually indistinguishable, as he put it. Rockwell was a A109 Augusta helicopter. Ours was an A109C, just a bit later model, Augusta helicopter. It was the same basic pattern of distribution. And if we look to Connelly, Gray, and other cases, you will see that they cannot duck the distribution pattern simply because they are a middle man or I would say in this case a component part manufacturer. But in Rockwell, that the appellate court relied on significantly and correctly, in addition to it being an A109C, it was the very same defect contention there that resulted in the crash of the A109 helicopter. So the distribution in that was essentially what they have here. It goes through, there was one additional step, I believe. There was a, they may have had a middle person between SNFA and Augusta over in Europe, but in any event, it goes through those steps to Augusta in Italy, and then it's to the Augusta distributor here in the United States for the sale of helicopters in this country. This isn't about a McIntyre one machine in which, then covering 50 states. We're talking about a worldwide operation for this company, which they acknowledge in their brief. They sell to Brazil and Argentina. The list is long with respect to the countries they're involved in, including the U.S. But we think that they have heavily permeated the market here in the United States. They certainly have worked in Illinois to establish their contacts. The ball bearings sold to Hamilton Sunstrand, part of that agreement, they were for what are called APUs, auxiliary power units, for the 787. So they were going to Boeing eventually. They may have been shipped in the invoices. You'll see the invoices. They are, the firm buying is listed as Rockford, says the firm. The firm they shipped it to, direction presumably of Rockford, I think that's reasonably clear, is to San Diego, a manufacturing plant. But nonetheless, the buy was here in Illinois, and the contract was here in Illinois. Now, I hesitate to skip over Justice Breyer and McIntyre. I really think McIntyre, perhaps the court felt unfortunately, did not really get to where they might like to have taken it, because they couldn't put together a majority there. Four, two, three. And it's quite clear from Justice Ginsburg, joined by Justice Kagan and Sotomayor, she, I would think, would know. She said at the end, I dissent, but I take heart in the fact that this does not speak for the court. So we don't have an overruling of Gray. It still stands as good law. We don't have an overruling of Connolly. It still stands as good law. And we're at worldwide Volkswagen, which really was a new or should have known standard. That's where we are. Stream of commerce, new or should have known. And shouldn't SNFA, even from 1982, when they were brought to suit here in the United States on the same distribution that the appellate court was dealing with and looking at, shouldn't they know that their products are here in the United States doing just what happened here, being utilized? Chicagoland area, second, maybe now third largest metropolitan area in the country. Air ambulances here. First responders, air ambulance. That's the kind of market that was being pursued. There was the ‑‑ I'm trying to think of the case. It was a southern district. It was actually a St. Louis district court, federal district court, talked about this, about us being the fifth largest state. Should not someone know or reasonably know that the helicopters that we've just supplied a component part to is very, very likely to arrive in this state? I think so. Mr. Smith, let me ask you this. On that line, you had earlier referred to these as high-end ball bearings. Yes. Does the record disclose how many manufacturers of this kind of high-end ball bearings are in the world? I believe our brief does address that. And I think it's a matter of single digit competitors. Three in one instance for a certain type of mechanism. I think there's like six in another. I don't have that number directly available, but it's something of that nature. It's a very small number of manufacturers. And as I mentioned, in that one memo, you can see that they're competing with U.S. companies coming over here to sell ball bearings and doing so. I didn't want to leave the podium without commenting on arising out of and relating to. It's not simply arising out of that standard and relating to. And there are a number of cases that address this issue that we listed in our materials. The northern laminate sales case, the Schneider case, CompuServe Patterson case. One case in particular, a Colorado appellate court case that we did cite, Etchison, E-T-C-H-I-E-S-O-N, I think was particularly good on this. They said that as a result of those activities, the contacts that we're talking about, and they're looking at the contacts I had mentioned with Hamilton Sunstrand, not just whether an aircraft comes in or it happens to be an aircraft arising out of that crash in that particular product. Is it a cause of action that's similar to that brought by the plaintiff? In other words, dealing with ball bearings. And that's what we have, a ball bearing manufacturer who's involved in sales here in Illinois and an aircraft that had that, a ball bearing from that company that failed and he died, Mike Russell died, in a relation to that worldwide distribution in the U.S. and Illinois. The point of not chasing chattel, I agree with that. You don't chase chattel around to determine. The Audi driving through Oklahoma, one vehicle driving through Oklahoma. The question is, what are the activities of the company? Where are they? Do they have contacts with us? Is it fair to bring them here? Is it fair for them to be doing business here in Illinois to the extent that they do and not respond to jurisdiction here in Illinois with the kind of activities they have here? We think not. The arising out of relating to cases that I've mentioned, I think, talk about a lenient and flexible rule with regard to that. And it should not be considered the same thing. Relating to is different than arising out of. And I think the court in the Etchison case likewise made that clear. I think the appellate court was correct to closely look at the Rockwell case, evaluate that. He correctly, I should say they, correctly evaluated what McIntyre was and what it isn't. It's not standing for that proposition. I think it's been reviewed, and there's a case from the Eighth Circuit that I saw that indicated if we're to be counting votes, which they wouldn't do, they said, but they did go about looking at what votes might be there. They addressed the issues of how that might go. But I don't think we can. I don't think we're going to look forward to what might be the decision of the court in the future. Thank you very much. We'd ask that you affirm the appellate court. Thank you. May it please the Court. In listening to Mr. Smith's argument, it strikes me that he has done precisely what Justice Ginsburg wrote in the Goodyear decision, issued the same day as McIntyre on the subject of general personal jurisdiction, caution that courts should not do. Mr. Smith melded the concepts of specific personal jurisdiction and general jurisdiction in a way that Goodyear very clearly says, and that's a majority opinion, Justice Tice. That's a unanimous opinion, pardon me. That unanimous Supreme Court said that those concepts can't be blended or melded. They're very distinct. Specific jurisdiction, as we've noted, requires litigation that arises out of the contacts with the forum. And that goes to Mr. Smith's suggestion that Justice Breyer's concurring opinion, the one that the plaintiff's brief suggests we should follow, and we can't disagree with that, he suggests that that opinion was limited specifically to the facts. And he points to the phrase, in the context of this case, I cannot agree, Justice Breyer said. But Justice Breyer's very next words were to explain what it was about the context of that case that made him reject the New Jersey Supreme Court's idea that potential sales in the United States as a whole might be sufficient minimum contacts for every single state in the union. He said, for one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between the defendant, the forum, and the litigation, it is fair to us to exercise personal jurisdiction over the defendant. That's a very clear statement that specific jurisdiction, which was an issue in McIntyre, requires, in Justice Breyer's view, some nexus, some interrelationship between the defendant's contacts and the specific forum. And there is no contact that the plaintiffs have discussed in their briefs or at oral argument today that establishes the requisite nexus. They point to some contacts that the SNFA has with Hamilton-Sunstrand in California and with other manufacturers in Arizona and Indiana. But none of those contacts is a contact with Illinois, and more importantly, none of those contacts supplies the basis for this cause of action. Ask yourselves what relevance the discovery into Hamilton-Sunstrand's activities might have had to a case arising out of the helicopter bearing that's at issue in this case. This is a particular bearing that is alleged to have failed, a particular bearing manufactured in France, sold to Italy, and then sold to Louisiana before being flown into Illinois. The nexus that's required to have litigation that arises out of the minimum contacts is simply not present. For another thing, Justice Breyer wrote, he couldn't reconcile so automatic a rule as the New Jersey Supreme Court would have promulgated with the constitutional demand for minimum contacts and purposeful availment, each of which rests upon a particular notion of defendant-based fairness. And as he put it, a rule like the New Jersey Supreme Court's would permit every state to assert jurisdiction in a products liability suit against any domestic manufacturer who sells its product made anywhere in the United States to a national distributor. And that rationale is exactly what the plaintiff would ask you to do here, only this time with international corporations, not just domestic manufacturers. That's a result that Justice Breyer quite clearly said could not comport with due process and would not respect the due process rights of the corporations. And in fact, the difference between being a domestic manufacturer and a foreign corporation, as we had in McIntyre, as we had in this case, was further significant to Justice Breyer, because he went on to say, further, the fact that the defendant is a foreign rather than a domestic manufacturer makes the basic fairness of the New Jersey Supreme Court's proposed rule still more uncertain. So he was even further concerned with the fact that a rule like that the New Jersey Supreme Court put forth, the very one that all of Mr. Smith's arguments this morning had been directed toward, would not respect the due process concerns that are so vital here. Consider what Mr. Smith has argued this morning. His argument has been aimed at establishing that SNFA should have known that its product was to be sold throughout the United States. And that requires first that you attribute the distribution network that AAC had and impute that network to SNFA in a way that the evidence simply doesn't support. But even if the national distribution network that was examined here, and that Mr. Smith has done his best to establish to exist, even if that national distribution network could be imputed to SNFA, the case law is quite clear, and not just in McIntyre, that a national distribution network is not enough to establish minimum contacts with every state in the union. The idea that there might be the potential for a product to go anywhere in the world, including into the United States and including potentially to any state in the union, is simply not enough to satisfy the requirement of purposeful availment of the benefits and protections of a particular state. Due process, if it means anything, is reflected in all of these cases as requiring that defendants or manufacturers or citizens throughout the world, really, or at least the United States and throughout the world, have the ability to structure their conduct in such a way as to know where it might expose them to lawsuits, where they might be hailed into court. What due process requires, just as much as it requires fair notice of a hearing, is fair notice of where one's conduct might expose it to suit. That's a principle that was not first set forth in McIntyre. It goes back far earlier than that. It's not enough, as Mr. Smith said this morning, for conduct to have permeated the market in the U.S. That wasn't enough in Wiles for this court, which recognized that the manufacturer in that case may have shown an effort to target the United States in ways, incidentally, that SNFA has not been shown to have done. But in Wiles, even if SNFA were like the defendant in Wiles, the Japanese defendant, who had targeted the entire United States, this court recognized that due process didn't permit minimum contacts to be found with the state of Illinois. And in reaching that conclusion, it was following worldwide Volkswagen, which had reached exactly the same conclusion, that the idea that there might be the potential for the car in that case, an inherently mobile product, the court recognized, that could go anywhere in the country. The court recognized, and Mr. Smith agrees, that the jurisdiction doesn't travel with the chattel. The idea that the car could go anywhere, could even be sold anywhere, because the court recognized the nationwide network of Volkswagen dealerships, that wasn't enough to show purposeful direction toward the forum state of New York in that case. And McIntyre only echoes those principles. And they're echoed not just in Justice Breyer's two-justice concurrence, which the plaintiffs have argued that you should follow, they're echoed also in Justice Kennedy's four-justice plurality opinion for a majority. Look also, though, if you would, to the dissenting opinion, for evidence that the Supreme Court, on facts like those of this case, would actually have been a unanimous decision in favor of not finding jurisdiction. Justice Ginsburg's dissent in McIntyre recognizes a number of factors in distinguishing, in her view, McIntyre from Asahi, where there was no jurisdiction. Justice Ginsburg recognized several factors that could almost be describing McIntyre, or just be describing SNFA in this case. She recognized, most importantly, that the defendant in McIntyre, the defendant in Asahi, unlike the defendant in McIntyre, was a component part manufacturer with little control over the final destination of its product in interstate commerce. And SNFA matches that description to a T. It's a component part manufacturer with no involvement, no control at all, over the ultimate destination of its products. So when you look to McIntyre, and you find the places in which the court agrees, there is at least a six-justice majority, and arguably a nine-justice unanimity, finding that on the facts of this case, there would be no basis for jurisdiction. Justice Gordon's opinion in the appellate court takes from McIntyre the basic truism, if I might take a moment to briefly conclude, the basic truism that under the right set of facts, jurisdiction might be based on an American distributor. What the appellate court got wrong was what those right set of facts might require. They require purposeful availment of the particular forum. They require at least knowledge that the product is to be sold or marketed in this forum. Without that, there can be no jurisdiction consistent with due process, and the appellate court's decision must be reversed. Thank you. Thank you, Mr. Howey and Mr. Smith, for your arguments. We present this morning case number 113909, John Russell v. S.N.F.A. is taken under advisement as agenda number 11.